Filed 10/4/16  P. v. Griffin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT LEE GRIFFIN,<br><br>    Defendant and Appellant. | F068898<br><br>(Super. Ct. No. F12901296)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan M. Skiles, Judge.

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephanie A. Mitchell and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Robert Lee Griffin was convicted by jury of two counts of committing a lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (a)) and one count of sexual

penetration of a child age 10 or younger (Pen. Code, § 288.7, subd. (b)).  Griffin admitted a prior conviction and stipulated to a prior prison term allegation (Pen. Code, §§ 667, subds. (b)-(I), 1170.12, subds. (a)-(d), 667.5., subd. (b)).  Griffin was sentenced to a total aggregate term of 131 years to life.

On appeal, Griffin contends (1) the trial court abused its discretion in admitting evidence of a prior 2006 misdemeanor sex crime and of data and images found on his computer; (2) that the trial court erred in refusing to give an instruction on the "fresh complaint" doctrine; (3) that CALCRIM No. 1193 was an incorrect statement of law; and (4) that the trial court abused its discretion in limiting evidence regarding a prior complaint of sexual molestation by one of the victims.  We affirm.

## STATEMENT OF THE FACTS

*Overview*

Griffin met I. in January of 2011 when she was nine years old.  Griffin worked with I.'s father, and he became friends with I.'s entire family.  At the time, Griffin lived in a trailer in Clovis.  Griffin had a daughter, Rosie.  I. frequently visited Rosie at the trailer.  Griffin, Rosie and I. would watch television and play board games together.  I. continued to go over to Griffin's trailer even after Griffin and Rosie had a falling out and Rosie no longer had contact with her father.  I. usually went with her best friend, M., and sometimes their younger siblings would join them, including I.'s sister, H.

In August of 2011, Griffin moved to a barn-like structure in Fresno he was renovating for the property owner.  I. and M. continued to visit him there, often spending the night, until I.'s mother learned in mid-November 2011 that Griffin was prohibited from having any contact with children.  The basis for the no-contact order was not disclosed, but it was stipulated that Griffin had been convicted in 2006 of misdemeanor sexual exploitation of a child (Pen. Code, § 311.3, subd. (a)) for videotaping his eight- and 12-year-old nieces in the bathroom and then using the videotape for the purpose of sexual stimulation.

*Victims' Accounts*

At trial, I., who was then 12 years old, testified that Griffin first made her feel uncomfortable at the trailer when she and M. were having a "foam fight" with shaving cream. Griffin grabbed I., put his hand under her shirt and rubbed her upper chest with shaving cream, laughing. When I. told Griffin to stop, he went over to M. and did the same thing to her.

On subsequent occasions, Griffin made I. uncomfortable by wrapping his arms around her while she was lying in bed, hugging her so tightly with his belly against her back that she could hardly breathe. Griffin told I. that he loved her. If I. did not respond in kind, Griffin would become mad and "throw a fit." I. told an interviewer at the Multidisciplinary Interview Center (MDIC) that this type of "snuggling" occurred at least five times at the trailer.[1] One time, I. looked at Griffin's cell phone and saw a photograph of her younger sister, H., asleep in her nightgown and underwear with her legs spread open. Griffin grabbed the phone from I. and told her she was not allowed to look at the photographs. When I. told Griffin she was going to tell her father, Griffin said he would kill him if she did. He also threatened to kill her dogs if they tried to protect her father.

After Griffin moved to the barn, I. continued to visit him for sleepovers. When she did, Griffin would place his hands down her pants as she was falling asleep. I. told the MDIC interviewer Griffin reached under her pajamas and rubbed her thighs before touching her "privates."

I. testified that on one occasion, as she was drifting off to sleep on a couch, Griffin put his hands inside her underwear and inserted a finger into her vagina. She felt his

---

[1]     The video-recorded interview was played for the jury, and a transcript was provided as a listening aid.

fingernails digging into her and it hurt. I. told the MDIC interviewer that the penetration lasted about two minutes until she moved away and he stopped.

I. testified that Griffin threatened to "kidnap" her because he said her parents did not treat her well. He threatened to kill her father if he would not let Griffin take her away with him. Griffin called I. "Princess Number One" and M. "Princess Number Two." I. had another nickname as well, and Griffin had that nickname tattooed on his arm. Griffin at times pleaded with I. to come over to his house. He even called her parents to try and cancel other plans she might have. Griffin bought I. a laptop computer, and he gave I. and M. at least $20 each time they visited, which totaled about $300.

M., who was 13 years old at the time of trial, testified that she and I. were next-door neighbors and M.'s mother became friends with Griffin through I.'s parents. After Griffin moved to the barn, M. and I. spent almost every weekend there. On one occasion, while M. was in a downstairs room, Griffin touched her on the outside of her "private part." On another occasion, Griffin kissed M. on the lips. Both made M. feel uncomfortable. Griffin told M. he was going to have her name tattooed on his body as well. M. testified that Griffin threatened to kidnap her and kill her mother.

M. told the MDIC interviewer[2] that she and I. spent a weekend at the barn. On the first night, M. and I. were talking in bed when Griffin came into the room and told them to "snuggle" with him. Griffin got on the bed and hugged both girls. He then placed his hand under M.'s shirt and rubbed her breasts. He also kissed her on the jaw and neck. The next night, some other girls were at the barn as well, and they painted and had pizza. At bedtime, M. and I. were lying together when Griffin came in and again said, "Let's snuggle." When they resisted, Griffin said, "You have to snuggle with me or I'm gonna be mad at you guys." They continued to resist, and Griffin eventually left the room. M. fell asleep, but awoke when she felt Griffin place his hand in her pants and rub her

---

**2**    See footnote 1, *ante.*

4.

between the legs with a lot of pressure. He also rubbed her buttocks and told her he loved her. At one point she felt Griffin's hand "inside" her vagina. M. was too frightened to tell Griffin to stop.

M. also told the MDIC interviewer that, while Griffin was giving her a ride in his truck, he placed his hand down her pants, and rubbed and inserted his fingers into her vagina. He also touched her breasts a second time when she was in the bathroom.

*Disclosure of the Assaults*

M. eventually told her older sister, Vanessa, that "things were happening that weren't supposed to and she didn't feel comfortable anymore going over" to Griffin's. M. and I. told Vanessa that Griffin "cuddled" and slept in the same bed as them, but they did not disclose to her that he had touched their private parts. They also told Vanessa they had seen photos on Griffin's phone of H. in her underwear.

Vanessa told her mother, Victoria, what M. and I. had told her. Victoria, in turn, told I.'s mother, Stella, and prohibited M. from going to Griffin's house for a while.

In mid-November 2011, a confidential informant reported to authorities that Griffin was having contact with children despite being prohibited from doing so. After law enforcement learned I. and her siblings were among those children, that information was provided to Child Protective Services (CPS). A CPS worker interviewed the children at their school and then referred the case to the sheriff's department for investigation.

Stella gave the sheriff's department a letter I. had written to her on December 20, 2011. Stella did not disclose the contents of the letter during testimony.[3] Stella also gave the sheriff's department multiple letters Griffin had written and mailed to I. One of those

---

**3**     The letter is not included in the clerk's transcript. The only description of its contents in the record is from the prosecutor's closing argument, in which she stated I. had written that "every time when I was going to sleep he would touch my chi-chis and put my [*sic*] hand down my pants."

letters stated: "Sorry for everything except loving you and spoiling you rotten. Still plan on doing that forever. There is nothing that will keep me from you, [I.,] [c]ount on it. Love, Robert." Another letter included the post-script: "If you talk to [M.] tell her I love her and miss her, okay. See you soon. Nobody, police or anyone, will keep me from you, [I.,] and you know I'm not playing around. I'll die for you and I will personally remove anyone that tries to hurt you. This too you know is the truth. Forever my love, Robert Lee Griffin, Jr."

I. testified she was slow to report the abuse to her mother because she had been through a similar situation before and did not want to go "through what I had to before." She testified she wanted to tell the truth about what happened because Griffin "ruined" her life and she wanted to "make sure that he did go to jail."

*Computer Evidence*

Sheriff's Detective David Rippe of the Internet Crimes Against Children Task Force conducted a forensic examination of Griffin's laptop computer. Rippe testified that Griffin's computer showed several Internet searches had been conducted under Griffin's user profile. Search terms included: "12-year-old erotic nude picks [sic]"; "12-year-old girls fucking"; "[n]ude images of preteen girls"; "[p]reteen girls fucking"; "ten-year-old … NUD"; and "fuck child pedo loli top." Ridde testified that "pedo" is an abbreviation for pedophile and "loli" an abbreviation for "Lolita," a common search term for child pornography.

Detective Rippe discovered numerous "thumbnail images"[4] on Griffin's hard drive of scantily dressed young girls in provocative poses. Eighteen of these images were printed in enlarged form and shown to the jury.

Detective Rippe also discovered several photos of I. and M. under Griffin's user profile. Some of the photos of I. were accompanied by titles, including "Mine,"

---

**4** Small copies of photos from the Internet that are saved onto a hard drive.

"Haunting my dreams," and "Sweetheart." There was also a photo of Griffin, shirtless, entitled "Daddy Griff."

*Expert Testimony*

Susan Napolitano, a psychologist, testified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS), and explained the five aspects or "steps" that are used to help understand children's responses to trauma, particularly sexual abuse. According to Napolitano, child sex abuse victims rarely report the abuse right away and, when they do, they often reveal it in piecemeal fashion. The "delayed" reporting aspect is often linked to the "secrecy" aspect of CSAAS, which is associated with "grooming," in which the perpetrator earns the trust of his victims by providing gifts and privileges.

*Defense*

Rosanne Garcia, the CPS worker who interviewed I. at school, testified that I. initially denied she had ever been touched inappropriately. She then began to cry and said she had been touched when she was five years old and the man who did it went to prison for life. I. told Garcia that, if anyone touched her that way again, she would tell her mother.

I. told Garcia she stayed overnight at Griffin's house and that he was nice to her. She also told Garcia that Griffin had given her and her friends gifts, including jewelry and a touch pad computer. I. told Garcia she considered Griffin a part of her family. I. then said she and her siblings were no longer allowed to see Griffin, and I. began to cry again. Garcia then interviewed Stella (I.'s mother), who told her I. initially denied she had been molested by Griffin, but later wrote a letter disclosing she had been.

Beatrice Grider testified Griffin came to live in a barn on her property in August of 2011 and was in the process of converting it into an apartment. Young girls often visited Griffin at the barn, but Grider never saw Griffin in bed with any of them, although she described one time when she went to the barn and Griffin and "the girls" were

7.

upstairs and it was dark. Grider told Griffin she did not want the girls around anymore because they were always coming into her house to use the bathroom.

On cross-examination, Grider stated that, after Griffin was released from custody in February of 2012, he lived with her, they had discussed marriage, and she had paid $3,000 to help him retain a lawyer.

Griffin's son, Dylan, testified that he lived with Griffin in the barn for four or five months, and that he saw children visiting his father on about 10 occasions. The children slept in the living room, while Griffin slept in his own room and Dylan slept in the upstairs loft. Dylan never heard the children complain, nor did they seem afraid.

Griffin's sister, Diana Solorio, testified that Griffin had always behaved "[f]ine" around her two children – a daughter, age nine at the time of trial, and a son, age 12.

Griffin's aunt, Sheryl Robledo, described Griffin's interactions with his own children as "definitely appropriate." Robledo testified she had seen Griffin attend church while many children were there and his behavior was "[c]ompletely appropriate."

*Rebuttal*

Sheriff's Deputy Tim Herzog testified that he interviewed I. in January of 2012, based on a report he received from CPS of possible sexual assault. I. told Herzog she sometimes spent the weekend at Griffin's house in the country, even when his own children were not there. I. told Herzog that Griffin had given her a video game, a laptop computer, and money. She told Herzog that Griffin liked to "snuggle" with her and M. at bedtime, he told them he wished he could kidnap both of them, and he called them "Princess One" and "Princess Two." I. said there was also inappropriate snuggling while she was on the couch in both Griffin's trailer and the barn. Specifically, I. told Herzog that on three or four occasions, as she was falling asleep, Griffin reached under her shirt and touched her chest, and then placed his hand down her pants and touched her privates. Griffin told I. that, if she refused to snuggle with him, he would take away her laptop computer and video games.

8.

## DISCUSSION

I. DID THE TRIAL COURT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF GRIFFIN'S PRIOR SEX CRIME OR THE DATA AND IMAGES FOUND ON HIS COMPUTER?

Griffin contends the trial court abused its discretion under state law and violated his federal constitutional right to due process when it admitted evidence of (1) his 2006 misdemeanor conviction for sexual exploitation of a child (Pen. Code, § 311.3, subd. (a)); (2) data regarding computer searches for child pornography on his laptop computer; and (3) images of child erotica found on his computer. We disagree.

*Applicable Law*

Generally, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)[5] However, in a criminal action in which a defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense if not made inadmissible by section 1101, so long as the evidence is not made inadmissible by section 352. (§ 1108, subd. (a).) The California State Legislature enacted section 1108 to "relax the evidentiary restraints" imposed by section 1101, "expand the admissibility of disposition or propensity evidence in sex offense cases," and "assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)[6]

---

[5] All further statutory references are to the Evidence Code unless otherwise stated.

[6] In *Falsetta*, the Supreme Court noted: "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the

"By removing the restriction on character evidence in section 1101, section 1108 now 'permit[s] the jury in sex offense … cases to consider evidence of prior offenses *for any relevant purpose*' [citation], subject only to the prejudicial effect versus probative value weighing process required by section 352." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505; accord *People v. Robertson* (2012) 208 Cal.App.4th 965, 990 (*Robertson*).) Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Factors to weigh include the "nature, relevance, and possible remoteness [of the uncharged sex offense], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra,* 21 Cal.4th at p. 917.)

"""'Prejudice' as contemplated by … section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption '"substantially outweigh"' the probative value of relevant evidence, a section 352 objection should fail."""" (*People v. Scott* (2011) 52

---

trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta, supra,* 21 Cal.4th at p. 915.)

Cal.4th 452, 490-491.)  Evidence should be excluded as unduly prejudicial "'"'"when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*Id.* at p. 491; see also *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [prejudice set forth in § 352 does not refer to prejudice or damage to a defense that naturally flows from relevant, highly probative evidence, but applies to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and has very little effect on the issues].)

We review a trial court's evidentiary ruling under sections 1108 and 352 for abuse of discretion and will reverse only if the ruling was arbitrary, whimsical, or capricious as a matter of law.  (*Robertson, supra,* 208 Cal.App.4th at p. 991.)

*Misdemeanor Conviction for Sexual Exploitation of Child*

In an in limine motion, the prosecutor sought to admit evidence of Griffin's 2006 conviction of sexual exploitation of a child (Pen. Code, § 311.3, subd. (a)) for secretly videotaping his two nieces, then eight and 12 years old, while they bathed and used the toilet.  The prosecutor argued the evidence was admissible both as propensity evidence under section 1108[7], as well as evidence of intent under section 1101, subdivision (b).  The prosecutor sought to introduce not only the circumstances of the conviction, but also Griffin's admission to a detective that he got his "jollies" from videotaping his nieces.

In finding the evidence admissible under section 1108, and that its admission did not violate section 352, the trial court stated the proposed evidence was "probative [in] that it shows prior inappropriate sexual conduct with two girls of similar ages to alleged

---

[7]     Possession of child pornography is a sexual offense as defined in section 1108, subdivision (d)(1).

victims in the current case." The trial court noted that, in both instances, Griffin took advantage of a position of trust of young girls under his care, the conviction was not unduly remote in time, there was only a "remote probability" of jury confusions, and the evidence was not inflammatory or unduly prejudicial. The trial court also ruled the evidence was admissible under section 1101, subdivision (b) "for the purposes of showing intent and/or lack of mistake." However, the trial court ruled that the prosecutor could not admit Griffin's statement to the detective (that he got his "jollies" from videotaping his nieces) and would instead instruct the jury as follows: "On July 13th, 2006, the defendant was found guilty by way of his plea to a misdemeanor violation of Penal Code Section 311.3(a) for secretly videotaping his 8- and 12-year-old nieces showering and using the bathroom." This stipulation, along with a limiting instruction, was read to the jury.[8]

Griffin argues the trial court abused its discretion in admitting evidence of his misdemeanor conviction under section 352 because his conduct in the prior conviction was too dissimilar to the charged conduct and was likely to evoke an emotional bias in the jury. We disagree.

Several factors favored admission of the evidence. The conviction, which occurred five years before the charged offense, was not remote in time. By limiting the evidence to court documents and a stipulation, the likelihood of confusing the jury was minimal. The potential for undue prejudice was minimized by preventing the prosecution

---

[8]     The limiting instruction, as read, stated: "The parties have stipulated that the defendant committed the crime of Penal Code Section 311.3(a), sexual exploitation of a child that was not charged in this case. You may, but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses and based on that decision also conclude the defendant was likely to commit and did commit the crimes charged in this case. The defendant's commission of the uncharged offense is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of the charged offenses. The People must still prove each charge and allegation beyond a reasonable doubt."

from introducing evidence of Griffin's admission of his motive in committing the prior offense.

In addition, the prior conviction was probative of whether Griffin committed the charged crimes because both involved preteen girls who were entrusted to his care. In both, Griffin took advantage of the victims being in his residence to invade their privacy. Although Griffin was not accused of touching his nieces, evidence that he secretly videotaped them while they were naked or partly undressed showed a prurient interest in young girls, contrary to his defense in the current charge that the allegations were fabricated. (See *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1118-1119 [rejecting defendant's argument that the probative value of the propensity evidence was insubstantial because of "'striking dissimilarities'" between uncharged conduct and charged crimes]; see also *People v. Soto* (1998) 64 Cal.App.4th 966, 991 [no abuse of discretion under § 352 because the "propensity evidence was extremely probative of appellant's sexual misconduct when left alone with young female relatives"].)

Neither was evidence of Griffin's prior sex crime inflammatory. As noted "[t]he prejudice [that] exclusion of evidence under … section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

In making a determination of undue prejudice, a trial court should evaluate whether "[t]he testimony describing defendant's uncharged acts … was no stronger and no more inflammatory than the testimony concerning the charged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) Here, the jury was not likely to be inflamed by

13.

evidence, in the form of a short stipulation, that Griffin videotaped his nieces five years prior, especially since the evidence of the charged crimes was far more egregious and damaging.

Griffin's reliance on *People v. Harris* (1998) 60 Cal.App.4th 727 is misplaced. There, the defendant, a mental health nurse, was charged with sexual misconduct with female patients who were vulnerable due to their mental condition. (*Id.* at pp. 730-731.) The trial court admitted evidence under section 1108 that over 20 years earlier the defendant had brutally raped a woman who had never been one of his patients, although the defendant was convicted of burglary with gross bodily injury, not rape, for the incident. (*Harris, supra,* at pp. 733-736, 738-739.) The appellate court concluded admitting the evidence was error because the rape was inflammatory, remote in time, and unlike the misconduct with which the defendant was currently charged. (*Id.* at p. 741.) In contrast, the offenses charged against Griffin include "meaningful similarities" with his earlier conviction – both involved young girls left in Griffin's care by a trusting parent. Both show Griffin's predatory nature and his propensity to victimize young girls for sexual gratification. In sum, the evidence of Griffin's prior offense was properly admitted.

*Computer Photographs and Search Data*[9]

At the start of trial, the prosecutor asked to introduce certain information taken from Griffin's computer, including photographs of "child erotica" found on the hard drive, and "various internet addresses visited by the defendant that are recorded on his computer." In a tentative ruling, the trial court stated it believed the photos were admissible under section 1101, subdivision (b), to show Griffin's intent or lack of

---

**9** We address these issues together as the images and data were obtained as part of the same search.

mistake; and that any Web sites visited by Griffin depicting child pornography would be admissible for the same purpose.**10**

The following day, the trial court addressed the issue of the 18 photographs it referred to as "child erotica," and described them as follows:

> "The photographs do not depict sex acts and many do not include underage children that are fully or partially nude. Some do show what appear to be underage girls posing topless."

The trial court stated it was inclined to find the photos demonstrated Griffin's relationship to underage girls and were relevant to the issue of intent and any lack of mistake. Defense counsel argued that the same objective could be accomplished with one-third or one-half of the 18 photos, and objected under section 352, the Sixth Amendment due process clause, and "the State's Thirteenth Amendment." The trial court ruled the items admissible, noting they were not duplicative of the same photograph, but duplicative in the fact that they all involved underage children in "somewhat provocative poses."

As for the file names and titles on some of the photographs, as well as admission of the specific photographs of the alleged victims, defense counsel stated he would "reiterate the Sixth Amendment and Thirteenth Amendment" argument, but would not argue further against their admission. The trial court ruled the items admissible.

On appeal, Griffin does not argue the computer photographs and related search terms were merely duplicative or excessive, as he did below. Instead, he argues this evidence was improperly admitted for the same reason the prior conviction evidence was improperly admitted: it was too dissimilar to the charged conduct to be of sufficient probative value. Respondent contends, and we agree, Griffin has forfeited this issue by failing to object below. (See *People v. Marks* (2003) 31 Cal.4th 197, 228 ["general

---

**10** The trial court indicated it would not allow one Web site, which appeared to involve adults, rather than children, engaging in sex acts.

objection to admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].)

In any event, we find Griffin's argument without merit. Our Supreme Court held in *People v. Memro* (1995) 11 Cal.4th 786 (*Memro*) (overruled on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2) that sexually suggestive and nonsexually suggestive photographs and magazines depicting clothed and unclothed prepubescent youths found in the defendant's apartment was admissible under sections 1101, subdivision (b) and 352, "as evidence of motive and intent to perform a lewd or lascivious act on [the victim] in violation of section 288." (*Memro, supra,* at p. 864.) The *Memro* court explained: "To be sure, some of this material showed young boys in sexually graphic poses. It would undoubtedly be disturbing to most people. But we cannot say it was substantially more prejudicial than probative, for its value in establishing defendant's intent to violate section 288 was substantial." (*Id.* at p. 865.)

Certainly, the photographs of "child erotica" and related search terms found on Griffin's computer was more than coincidental and undercut Griffin's position that I. and M. fabricated the offenses against him. There was nothing unduly inflammatory about the evidence. None of the photographs depicted sex acts, but at most featured "underage girls posing topless." The search terms were merely that: names of the web sites Griffin had visited. The evidence was "admissible as probative of [Griffin's] intent to do a lewd or lascivious act with [I. and M.]," (*Memro, supra,* 11 Cal.4th at p. 865), and we find no abuse of discretion.

*Due Process*

Griffin also contends that the trial court's erroneous admission of his prior conviction, the photographs, and the search terms had the legal consequence of violating the due process clause of the Fourteenth Amendment, because it rendered his trial fundamentally unfair. We are not persuaded; the evidence was not erroneously admitted.

16.

"'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.) "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920; see *People v. Kelly* (2007) 42 Cal.4th 763, 787.) As the United States Supreme Court has explained, "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly." (*Dowling v. United States* (1990) 493 U.S. 342, 352.)

The evidence relating to Griffin's prior conviction and possession of child pornography and related computer searches was certainly damaging. However, although the evidence was abhorrent and disturbing because it involved child pornography, the evidence did no more than accurately portray Griffin's prior offense and the child pornography found on his computer. We cannot conclude that the presentation of this evidence rendered Griffin's trial fundamentally unfair.

II. DID THE TRIAL COURT ERR PREJUDICIALLY AND VIOLATE GRIFFIN'S DUE PROCESS RIGHTS WHEN IT REFUSED DEFENSE COUNSEL'S MODIFICATION TO CALCRIM NO. 318?

Griffin next contends that the trial court prejudicially erred when it refused to give defense counsel's modification to CALCRIM No. 318. Essentially, he claims the instruction, although generally legally correct, is improper here because "fresh complaint" evidence was introduced for a limited, nonhearsay purpose. He further contends the trial court's refusal violated his due process rights. We find no prejudicial error.

17.

*Background*

As previously discussed, the allegations of sexual abuse first came to light when M. told her sister Vanessa that when she and I. were at Griffin's house, "things were happening that weren't supposed to and she didn't feel comfortable going over there." M. and I. told Vanessa that Griffin "cuddle[d]" with them in bed, but they did not disclose details. I.'s mother, Stella, testified that I. revealed the sexual abuse in a letter I. slipped under her mother's door a few days after she asked I. what was wrong. Defense witness, CPS worker Garcia, said that when she first interviewed I. on January 31, 2012, I. denied she had been touched inappropriately by Griffin. Sheriff's Deputy Herzog testified, as rebuttal witness, that when he interviewed I., on the evening of January 31, 2012, she revealed Griffin touched her chest and vagina on three or four occasions during overnight visits. Both I. and M. provided details during MDIC interview in February 2012, and testified consistent with those statements.

*Instruction Request*

During a discussion on jury instructions, the trial court stated it planned to give CALCRIM No. 318 at the prosecution's request. That pattern instruction applies to pretrial statements by all witnesses and states:

> "You have heard evidence of statements that witnesses made before the trial. Generally, if you decide that a witness made a particular statement, you may use that statement in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in that statement is true." (CALCRIM No. 318.)

Defense counsel requested a modified version of that instruction to reflect the "fresh complaint" doctrine, i.e., that evidence of an initial report of a sexual offense is admissible for the limited, nonhearsay purpose of establishing only that such a complaint was made. The trial court questioned how that might apply in this case because it appeared that the defense theory was that when the victims initially denied any molest occurred, they were telling the truth. Counsel replied that jurors could interpret some of

18.

the victims' early statements as containing allegations of sexual abuse, in which case they should be instructed not to consider them for their truth. The trial court stated it would need to see "specifically what modification or pinpoint instruction is being requested."

The following day, defense counsel proposed adding the following language to the pattern instruction:

> "However, as to the child witnesses, if you decide that a child witness made a particular written or unrecorded statement before the trial disclosing the offense(s) charged, you may use that statement only for the limited purpose of considering the fact of, and the circumstances surrounding, the child's disclosure. You may, but are not required to, consider the fact that the disclosure was made and the circumstances under which it was made in determining whether the offense(s) have been proven to have occurred."

The trial court asked defense counsel to specify to which statement this language might apply. Counsel acknowledged the language would not apply to the victims' statements during the MDIC interview, but would apply to any disclosures I. made to Stella, Vanessa, or "law enforcement," and any statement M. made to Vanessa or her own mother. The trial court requested defense counsel provide authority requiring modification of CALCRIM No. 318 to reflect the "fresh complaint" doctrine. When counsel was unable to do so, the trial court denied the request. The jury was subsequently instructed with the pattern instruction without modification.

After the verdicts were rendered, the trial court placed on the record the reasons for its decision, stating:

> "The court's understanding, and I think this was consistent with the testimony, was there were initial denials or limited statements of something happening and then subsequent to that either consistent or inconsistent statements regarding those initial complaints. So to the extent it wasn't clear on the record, those are coming in under hearsay exception for prior inconsistent or consistent statements."

19.

*Applicable Law and Analysis*

The fresh complaint doctrine permits the admission of evidence of the victim's complaints disclosing the alleged sexual offense, not to prove the truth of the statement, but to establish the fact of, and the circumstances surrounding the victim's disclosure. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) In the absence of such evidence, the jury may be left with the impression that the victim did not complain and, therefore, tend to doubt the veracity of the victim's testimony at trial. (*Id.* at p. 755.) On request, the trial court must instruct the jury as to the limited purpose for which the fresh complaint evidence was admitted. (*Id.* at p. 757.)

Here, defense counsel requested CALCRIM No. 318 be modified as to any disclosures I. made to her mother Stella, M.'s sister Vanessa, or "law enforcement," and any statement M. made to Vanessa or her own mother Victoria. While acknowledging counsel's point, the trial court nonetheless refused to instruct on the limited nature of the evidence because it found that the evidence was also admissible as a prior consistent or inconsistent statement.

We need not address whether the trial court erred, because any error concerning the failure to give a limiting instruction was harmless; it is not reasonably probable a different result would have been reached had such an instruction been given. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Both I. and M. testified at trial. Vanessa, Stella and Victoria's testimonies were merely consistent with and cumulative of I. and M.'s testimonies. Vanessa testified, for example, that M. told her "things were happening that weren't supposed to," and I. and M. both told Vanessa that Griffin "cuddle[d]" and slept in the same bed with them and that they had seen photos of H. in her underwear on Griffin's phone. Stella testified that when she first confronted I. about any possible abuse, I. did not say anything, but I. later wrote her a letter in which "[e]verything you don't want to be true is true." The evidence was therefore merely cumulative, and cumulative statements that repeat facts established by other means are not prejudicial.

20.

(*People v. Blacksher* (2011) 52 Cal.4th 769, 818, fn. 29; see also *People v. Manning* (2008) 165 Cal.App.4th 870, 881 [failure to give limiting instruction is harmless error where victim testified at trial]; *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526 [admission of hearsay statements is harmless error where declarant testified at trial].) In addition, because both I. and M. testified at trial, the jury could judge their credibility firsthand without relying on their "secondhand statements to other people." (*People v. Manning, supra,* at p. 881.)

As for Deputy Herzog's testimony, it was admissible as a prior consistent statement because it was introduced to rebut CPS worker Garcia's testimony that I. had denied Griffin abused her, suggesting I.'s testimony at trial was fabricated. "A prior consistent statement is admissible as an exception to the hearsay rule if it is offered after admission into evidence of an inconsistent statement used to attack the witness's credibility and the consistent statement was made before the inconsistent statement, or when there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or improper motive, and the statement was made before the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)" (*People v. Kennedy* (2005) 36 Cal.4th 595, 614, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) I.'s prior consistent statements to Deputy Herzog were admissible to rehabilitate her and to support her credibility after Garcia's testimony that I. reported no current abuse.

To the extent, if any, that the trial court erred in failing to instruct the jury on the limited use of "fresh complaint" evidence, the error was harmless.

*Due Process Violation*

Griffin also contends that the trial court's failure to give a limiting instruction violated his federal constitutional rights to present a complete defense and for the prosecution to prove its case beyond a reasonable doubt. However, "[m]ere instructional error under state law regarding how the jury should consider evidence does not violate

21.

the United States Constitution." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176.) Failure to give a limiting instruction, such as the one requested by Griffin, "is not one of the '"very narrow[]"' categories of error that make the trial fundamentally unfair." (*People v. Carpenter*, *supra,* at p. 392, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 73.) Thus, to the extent there was error, it was not of federal constitutional dimension.

III. DID CALCRIM NO. 1193 VIOLATE GRIFFIN'S DUE PROCESS RIGHTS BECAUSE IT IMPROPERLY ALLOWED THE JURY TO USE THE CSAAS EVIDENCE TO DETERMINED THE VICTIMS' CREDIBILITY?

The jury was instructed pursuant to CALCRIM No. 1193 as follows:

"You have heard testimony regarding Child Sexual Abuse Accommodation Syndrome. The testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the charges against him. You may consider this evidence only in deciding whether or not [I.]'s or [M.]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

Griffin contends the instruction impermissibly allowed the jury to use the expert testimony on CSAAS to determine whether I. and M.'s molestation claims were true. More broadly, he argues the instruction is contrary to settled law prohibiting the use of CSAAS evidence as evidence that the alleged victims' molestation claims are true. For the reasons we explain, it is not reasonably likely the jury applied the instruction in the impermissible manner Griffin claims.

It is long settled law in California that CSAAS testimony is admissible only for the limited purpose of disabusing the jury of any misconceptions it may hold concerning how child molestation victims commonly react or should react to being molested. (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of

abused children's seemingly self-impeaching behavior ....' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) "CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience. [Citation.]" (*People v. Bowker, supra,* at p. 394.)

Griffin argues parts of CALCRIM No. 1193 which permit the jury to use CSAAS evidence in evaluating complaining witness's credibility is contrary to settled law regarding the relevance and use of CSAAS testimony. He argues the instruction, in essence, is the same as telling the jury to use the CSAAS evidence to determine whether the victim's molestation claim is true. Not so.

In addressing a claim of jury misinstruction, we assess the instructions as a whole and view the challenged instruction in context with other instructions to determine whether there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) We also presume that the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.) In light of CALCRIM No. 1193 in its entirety, and other instructions given, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence in determining that the molestation occurred or that I. and M.'s molestation claims were true.

The jury was initially instructed to "[p]ay careful attention to all of these instructions and consider them together" (CALCRIM No. 200), and that "certain evidence was admitted for a limited purpose" and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303). CALCRIM No. 1193 then told the jury that the CSAAS evidence was not evidence that Griffin molested I. or M., and to use the CSAAS evidence "only" for the limited purpose of determining whether I. or M.'s conduct was inconsistent with the conduct of a child who had been molested "and in evaluating the believability of their testimony" that the molestations occurred.

23.

Reading all of the instructions together, and each in light of the others, it is unlikely the jury interpreted CALCRIM No. 1193 as allowing it to use the CSAAS evidence in determining that the molestations occurred or that I. and M.'s claims were true, per se. Rather, it is likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence in evaluating the believability of I. and M.'s testimony that the molestation occurred, in light of the evidence that I. and M. engaged in conduct seemingly inconsistent with the conduct of a child who had been molested after the molestations occurred.

There is a distinction between using CSAAS evidence for the impermissible purpose of inferring a child's molestation claims are true – which the first clause of CALCRIM No. 1193 expressly prohibits – and using CSAAS evidence for the permissible purpose of evaluating the believability of the child's trial testimony that the molestations occurred in light of evidence that the child engaged in conduct seemingly inconsistent with the child's molestation claims, after the molestations allegedly occurred. As stated in *People v. McAlpin, supra,* 53 Cal.3d at page 1300: Expert testimony on CSAAS "is admissible to rehabilitate [the child] witness's credibility when the defendant suggests that the child's conduct after the incident – e.g., a delay in reporting - is inconsistent with his or her testimony claiming molestation." CALCRIM No. 1193 and the other instructions limited the jury's consideration of the CSAAS to its permissible purpose.

In sum, in view of the instructions as a whole, it is not reasonably likely the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence for the impermissible purpose of determining the molestations occurred or that I. and M.'s molestation claims were true. Rather, the jury likely understood the instruction as permitting it to use the CSAAS evidence solely for the distinct and permissible purpose of evaluating I. and M.'s credibility as witnesses in light of the evidence that their

24.

conduct following the alleged molestations was seemingly inconsistent with the conduct of a child who had been molested. We reject Griffin's claim to the contrary.

IV. DID THE TRIAL COURT VIOLATE GRIFFIN'S DUE PROCESS RIGHTS TO PRESENT A COMPLETE DEFENSE WHEN IT EXCLUDED EVIDENCE OF THE ALLEGED VICTIM'S PRIOR MOLESTATION?

Before the presentation of evidence, the trial court ruled the defense could elicit evidence I. had previously reported another man had molested her, but not the details of that prior molest. Griffin contends that trial court, in doing so, abused its discretion by failing to conduct a hearing into the matter and violated his Sixth Amendment right to confront adverse witnesses. We find no error.

*Background*

The prosecutor filed an in limine motion to prohibit the defense from eliciting details regarding a prior molestation of I. The motion acknowledged the relevance that I. had been the victim of a similar crime years earlier, that she had testified at trial, and that she did not want to go through it again. But the motion argued further details of the prior incident were irrelevant.

At the hearing on the motion, the trial court indicated it was inclined to grant the prosecution's motion because it did not see the relevance of the underlying facts or circumstances of the prior molestation. Defense counsel stated he might want to explore the details of the prior incident because I. reportedly stated she did not know why Griffin touched her the way he did. Defense counsel argued, "logically one would think that somebody's been molested before, while they would not approve of being molested again, would at least know why it's happening." The trial court observed that I. could have meant she did not understand why Griffin, someone she knew and trusted, had molested her, rather than wondering why a man would do that to a child.

Defense counsel requested a pretrial hearing to explore the matter further. The prosecutor objected to any questioning of I. regarding her understanding of why Griffin

25.

touched her in the way he did. The trial court then clarified defense counsel could ask I. "whether she knew why he was doing what he was doing," but that was different than saying "because of the fact that you had a prior molestation isn't it true you would know why he was doing what he was doing." When asked if that alleviated his concern, defense counsel replied: "I think it's helpful. I don't think I want to go into the prior specifics. I think that just – it's just not helpful." The trial court finalized its ruling as follows:

> "Okay. As it relates to the use of the fact that one of the alleged victims apparently does have a prior molestation in their history that did involve some court proceedings, the court is finding that evidence regarding the specific facts and/or circumstances of the prior molestation is inadmissible. That does not preclude defense counsel from asking about what the victim, or alleged victim, may or may not have known about what was going on in the current alleged conduct. But as to going into the underlying facts and circumstances of the prior molest, the court is precluding that."

At trial, defense counsel elicited evidence about the prior molestation in the context of asking I. about her interview with CPS worker Garcia. Counsel elicited evidence I. told Garcia she knew the difference between "a good touch and a bad touch," and that she said she had been touched inappropriately when she was five years old. I. also confirmed that she told Garcia the person who had touched her went to prison for the rest of his life and she never wanted to go through that experience again. I. also said that if anyone else touched her in the same way, she would tell her mother.

*Applicable Law and Analysis*

Generally, a defendant may not question a witness who claims to be the victim of sexual assault about the victim's prior sexual activity. (§ 1103, subd. (c)(1); *People v. Mestas* (2013) 217 Cal.App.4th 1509, 1513.) Section 782, however, provides an exception to this general rule, and applies when the defense seeks to introduce relevant evidence of prior sexual conduct of a complaining witness in order to attack the complaining witness's credibility. (See generally *People v. Bautista* (2008) 163

Cal.App.4th 762, 781-782; *People v. Chandler* (1997) 56 Cal.App.4th 703, 707-708; *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 (*Daggett*).)

In *Daggett* the defendant was convicted of molesting a child under the age of 14. (*Daggett, supra,* 225 Cal.App.3d at p. 754.)  On appeal, the defendant successfully challenged the trial court's refusal to hold a hearing on the admissibility of evidence that the child had been previously molested by two older children. (*Id.* at p. 757.)  The defendant's offer of proof consisted of evidence that the child had told a mental health worker and a doctor who had examined him that he had been molested by two older children when he was five years old. (*Ibid.*)

The *Daggett* court discussed the relevance of a molest victim's sexual history:

"A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts.  This is because knowledge of such acts may be unexpected in a child who had not been subjected to them.  [¶]  In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant.  Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted."  (*Daggett, supra,* 225 Cal.App.3d at p. 757.)

We reject Griffin's claim that the trial court prejudicially erred when it found specific facts or circumstances of I.'s prior molestation inadmissible.

First, defense counsel did not file a motion, as required by section 782, and thus Griffin had no right to a pretrial hearing on the admission of the proffered evidence. Section 782 requires the defendant to file a written motion to the court, and an affidavit with an offer of proof for why that evidence is relevant.  (§ 782, subd. (a)(1) & (2).)  If the court finds the offer of proof sufficient, it must order a hearing outside the presence of the jury and allow the complaining witness to be questioned regarding the offer of proof. (§ 782, subd. (a)(3).)  At the conclusion of the hearing, the court can make an order

27.

stating what evidence may be introduced by the defendant and the nature of the questions permitted. (§ 782, subd. (a)(4).) This procedure applies to prosecutions for various sex crimes, including Penal Code section 288. (§ 782, subd. (c)(1).)

Second, as for the trial court ruling itself, the court amended its preliminary decision in order to address defense counsel's reasons for wanting to question I. about the prior incident. It then ruled counsel could ask I. if she knew why Griffin was touching her, but could not go into the underlying facts and circumstances of the prior molest. When asked if that alleviated his concern, defense counsel replied: "I think it's helpful. I don't think I want to go into the prior specifics. I think that just – it's just not helpful." Because counsel dropped his objection at that point, he cannot now claim the trial court erred in not holding a further hearing or preventing him from going into specifics of the prior incident. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1255 [withdrawal of objection to introduction of evidence forfeits issue on appeal]; see also *People v. Robertson* (1989) 48 Cal.3d 18, 44 ["Defendant, having withdrawn his objection to the evidence, cannot now complain of its admission"].)

Finally, as for Griffin's claim that exclusion of the evidence denied him a fair trial or to confront witnesses against him, we disagree. There is no fair trial problem with exclusion of all such evidence under Evidence Code section 1103. "That limited exclusion no more deprives a defendant of a fair trial than do the rules of evidence barring hearsay, opinion evidence, and privileged communications." (*People v. Blackburn* (1976) 56 Cal.App.3d 685, 690.) Therefore, because the trial court may properly exclude all such evidence without violating a defendant's fair trial rights, there is no merit to the argument that not admitting some of the evidence under Evidence Code section 782 deprives the defendant of a fair trial. (*People v. Mestas, supra,* 217 Cal.App.4th at p. 1517.)

**DISPOSITION**

The judgment is affirmed.

                                          _____

                                          FRANSON, J.

WE CONCUR:


_____

HILL, P.J.


_____

GOMES, J.